## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

WESLEY G. STOCKTON,

        Plaintiff,


v.                         **MEMORANDUM OF LAW & ORDER**
                            Civil File No. 09-3721 (MJD/FLN)

NORTHWEST AIRLINES, INC.,

        Defendant.

---

Stephen C. Fiebiger, Stephen C. Fiebiger & Associates, Chartered, Counsel for Plaintiff.

Timothy R. Thornton and Molly B. Thornton, Briggs & Morgan, PA, Counsel for Defendant.

---

## I.      INTRODUCTION

This matter is before the Court on Defendant Northwest Airlines, Inc.'s Motion for Summary Judgment.  [Docket No. 14]  The Court heard oral argument on March 18, 2011.

## II.     SUMMARY OF THE COURT'S OPINION

The Court denies Defendant's motion for summary judgment.  Preemption under the Railway Labor Act does not apply.  There are genuine issues of

material fact regarding whether Plaintiff received notice of NWA's bankruptcy,

whether NWA engaged in an interactive process for reasonable accommodation,

and whether NWA retaliated against Plaintiff.

## III.   BACKGROUND

### A.   Factual Background

#### 1.   The Parties and the CBA

Defendant Northwest Airlines, Inc. ("NWA"), hired Plaintiff Wesley

Stockton in 1989.  During his time at NWA, he was employed in various

positions such as an engine test cell technician, 747 mechanic, and sheet metal

shop technician.

Stockton's employment with NWA was governed by the collective

bargaining agreement ("CBA") between NWA and the Aircraft Mechanics

Fraternal Association ("AMFA").  The CBA contained a mandatory grievance

procedure applicable to disputes arising out of the CBA or disciplinary and

discharge actions.

### 2.    Stockton's Injuries

During his time working at NWA, Stockton suffered injuries to his neck, back, knees, and foot.  In 1997, he was deemed to have a 3.5% permanent partial disability based on his neck injury.

On June 13, 2005, Stockton was medically excused from work to have a total left knee replacement evaluated.  Soon after, he underwent a total replacement of his left knee.

### 3.    AMFA Strike

In August 2005, while Stockton was out on medical leave, AMFA employees went on strike.  NWA administratively designated the status of all AMFA members, including Stockton, as on strike.  NWA later determined that AMFA employees who were out on family or medical leave should not have been designated as being on strike and corrected this designation.  As a result of the strike, the last position that Stockton had held – as a plant maintenance technician – was eliminated.

After the strike, AMFA entered a new CBA with NWA that provided that employees out on layoff status for 24 months without being called back would be removed from payroll and employment rolls.  Employees out for on-the-job

injury ("OJI") would not have been impacted until the end result was known, and then they would have been placed on a layoff status.

### 4.    2005 Restrictions

In October 2005, Stockton was released for work with permanent restrictions: no pushing or pulling more than 50 pounds; no standing or walking more than 5 hours per day; no climbing more than 1 hour per day; no bending, kneeling, or squatting; no lifting more than 25 pounds; and rest 5 to 10 minutes every hour.  Stockton began working with Tom Saby, a qualified rehabilitative consultant ("QRC"), to explore alternative employment opportunities.

### 5.    Toolbox Incident

In February 2006, while he was on OJI leave, Stockton returned to NWA to retrieve his toolbox.  Stockton found the toolbox smashed and vandalized.  After an altercation with NWA management and police involvement, eventually, NWA purchased a new toolbox for Stockton and replaced the missing tools. Stockton testified that he did not know who was responsible for the damage to the toolbox or why they did it.

### 6.    2006

In April 2006, Stockton's doctor re-evaluated his neck and back and noted that he was "unable to work because of the increase in pain and at this time he has reached a decision to proceed with treatment since he has continued difficulty."  Stockton's search activities with his QRC were suspended, and, in August or September 2006, he underwent neck and back fusion surgery. Thereafter, he was medically precluded from returning to work until January 2, 2007.

### 7.    2007

Stockton was cleared to return to work effective January 2, 2007.  His neck and back injuries did not result in any job limitations, but the permanent restrictions associated with his knee were still in place.  Because the last position that Stockton had held – plant maintenance – had been eliminated, he was offered a line maintenance technician job.

In December 2006, Stockton was referred to Greg Lambert, an accommodations specialist with NWA.  Lambert contacted Stockton to begin the process of conducting an accommodation assessment to determine if Stockton could perform the necessary job functions for his new position.

### 8.     First Accommodations Meeting

On January 15, 2007, Stockton participated in the first NWA accommodations assessment.  Stockton, Saby, Lambert, Stockton's union representative, and NWA managers participated.  At that meeting, Lambert informed Stockton that he had determined that the line maintenance position required that the employee work on all aspects of the aircraft, which frequently required lifting more than 50 pounds and that the employee engage in frequent bending, squatting, and kneeling.

At the meeting, Stockton's union representative stated that Stockton should be able to exercise his seniority to bump into another position.  No specific jobs were discussed, and the meeting focused on seniority and bidding rights.  NWA suspended the accommodations assessment until Stockton successfully bid for and was awarded a position.

### 9.     Poster in the Security Shack

When Stockton and his QRC arrived at NWA for the January meeting, they saw Stockton's employee badge posted in the security guard shack along with a dozen others and a posting stating that these employees should not be

admitted.  NWA claims that the posting was a result of the toolbox incident in February 2006.

### 10.    Layoff Letter and Stockton's Exercise of Seniority

On January 25, 2007, NWA Human Resources Manager Terry Tanberg sent Stockton a layoff letter.  The letter stated that Stockton had been released to work in plant maintenance, but his position had been eliminated.  Tanberg advised Stockton that, under the AMFA CBA, he could exercise seniority and bump into another position.  Under the CBA, Stockton had five days to exercise his seniority.  If he did not exercise his seniority, then he would be placed in layoff status.  Stockton exercised his seniority into a sheet metal shop technician position, a position he had previously held.

### 11.    Second Accommodations Meeting

After Stockton was awarded the sheet metal shop technician job, Lambert initiated the accommodations assessment for that position.  There had been no accurate written job description of the position since the 2005 strike.  The sheet metal shop repairs and fabricates aircraft parts.  Lambert discussed the position requirements with the department manager, Dave Brandt.

NWA asserts that this job involved removal of aircraft parts, transport of the parts to the shop for repair or fabrication, repair and fabrication, return transportation, and, often, installation on the aircraft. Lambert determined that the essential job functions of a sheet metal shop technician were lifting, carrying, pushing, and pulling a variety of parts and equipment that may weigh up to several hundred pounds; frequent and prolonged work in awkward positions to access different aircraft components and, in particular, bending, squatting, and kneeling on or in different areas of the aircraft or when working on aircraft components in the shop; occasional climbing of stairs, work platforms, and ladders to access aircraft compartments and interior or exterior zones of the aircraft; and intermittent to prolonged standing and walking during a 10-and-a-half hour shift with approximately 50 minutes of break time. Lambert also noted that sheet metal shop technicians regularly worked in the oxygen shop, which involved bending and lifting heavy oxygen cylinders. Approximately 10% of the time, they also performed aircraft maintenance, which included lifting, pushing, and pulling of up to 100 pounds.

On February 2, 2007, Stockton reported to work for the sheet metal shop technician position and was directed to a meeting. Stockton, his QRC, Brandt, a

human resources representative, and Lambert participated in the February 2, 2007, meeting.  They discussed the essential functions of the sheet metal position in light of Stockton's permanent restrictions.  Both Stockton and his QRC offered accommodation suggestions for the work in the shop, but they could not offer accommodations for the work in the aircraft.

Stockton had previously worked in the shop in 2004 and 2005.  At that time, his duties had primarily involved bench work on parts.  The work was not done on an aircraft; nor did it involve heavy lifting.  NWA notes that, after the 2005 strike, NWA abolished many of the previous restrictions on cross-utilization of aircraft maintenance personnel.

During the February meeting, the parties discussed how the job had changed after the AMFA strike.  Because Stockton's permanent restrictions precluded him from performing job functions in and on the aircraft, Stockton and Saby suggested that Stockton be permitted to work exclusively in the sheet metal shop, which he had previously been able to do within the same restrictions, or that a narrow crane be used inside the aircraft to move heavy objects, such as cockpit seats.  Stockton also suggested that certain tasks in the shop could be performed while sitting, instead of bending at the knee.

Lambert concluded that none of these suggestions were reasonable: the cranes would be too heavy for Stockton to lift and too bulky for the cramped aircraft areas, and sitting instead of kneeling was not always possible because some areas in the aircraft may be too low to sit in and the employee would have to kneel or lay down.  Lambert concluded that "[n]o reasonable, accommodations were identified that would enable Mr. Stockton to perform all of the essential functions at issue."

### 12.     Alternate Duty Exploration

On February 20, 2007, NWA denied Stockton's accommodation request and, pursuant to the CBA, he was returned to layoff status.

NWA then offered Alternate Duty Exploration ("ADE") for 90 days.  ADE provided NWA employees with resources for applying for other positions within the company by, for example, helping them prepare resumes or explaining how different CBAs operate.  Stockton testified that Lambert failed to inform him of AMFA positions within his restrictions or classifications that he could bump into.

In mid-March, Lambert allegedly sent Stockton a list of current open positions.  Lambert testified that he never received the letter.  In any case, the

letter did not identify any open salaried AMFA positions.  Nor did it identify

AMFA positions for which Stockton could have exercised bumping rights.

Stockton applied for multiple NWA positions, such as tech writer and line

maintenance manager.  NWA would not provide him with an ID badge or

physical access to Human Resources, so he could not use the NWA computers

and view all possible jobs.

By April 2007, Saby, Stockton's QRC, determined that it would be in

Stockton's best interest to retrain him because "[h]is transferable skills were not

sufficient, combined with his work restrictions, to find work that would be both

medically and economically appropriate."  However, he was not hired for any

position when the ADE period ended on May 22, 2007.

### 13.   Disability Insurance Benefits

NWA provided Stockton with erroneous information for disability

insurance benefits that delayed his application for several months.  Initially, he

was denied disability insurance and told he had no coverage.  Later, he was sent

disability claims information by the wrong insurance carrier.  He eventually did

apply for and receive disability benefits from the correct carrier.

**14.   EEOC Charge**

On June 28, 2007, Stockton filed an EEOC charge alleging that NWA discriminated against him based on retaliation and disability.

There is no evidence that Stockton applied for any more jobs within NWA after May 2007.

On February 17, 2009, NWA sent Stockton a letter informing him that, because he had been on layoff status for 24 consecutive months, his employment with NWA had ended effective January 27, 2009, in accordance with the CBA.

On September 30, 2009, the EEOC issued Stockton a right to sue letter.

**B.   Procedural Background**

On December 29, 2009, Stockton filed a Complaint against NWA in this Court. He filed an Amended Complaint on January 3, 2010, alleging: Count One: Violation of the Americans with Disabilities Act ("ADA") – 42 U.S.C. § 12101, et seq.; and Count Two: Violations of Minnesota Human Rights Act ("MHRA").

NWA now moves for summary judgment on both counts.

## IV.   DISCUSSION

**A.   Summary Judgment Standard**

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material

12

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate

when "there is no dispute of fact and where there exists only one conclusion."

Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

### B.      Bankruptcy Discharge

#### 1.      Facts Related to the NWA Bankruptcy

On September 14, 2005, NWA, its parent corporation, NWA Airlines

Corporation, and other Northwest subsidiaries filed bankruptcy under Chapter

11.  The bankruptcy court confirmed the reorganization plan on May 18, 2007,

and set May 31, 2007, as the Effective Date of confirmation.  The Confirmation

Order provided that all pre-confirmation claims "of any kind, nature or

description whatsoever against or in the Debtors" were discharged.

(Confirmation Order ¶ 29.)  All creditors and claimholders were permanently

enjoined from filing, pursuing, or attempting to collect upon any discharged

claims, absent relief from the bankruptcy injunction.  (Id. ¶ 35.)

NWA has submitted affidavits of mailing averring that, like all other

current and former NWA employees, Stockton was mailed multiple notices

during the bankruptcy proceedings.  The affidavit lists two different addresses in

St. Paul, Minnesota, for Stockton.  Notices purportedly mailed to Stockton

included 1) the Notice of Bar Date for the Filing Administrative Expense Claims,

dated May 31, 2007 ("2007 Bar Date Notice"); and 2) the Notice of Entry of Order

Confirming Debtors' First Amended Joint and Consolidated Plan of

Reorganization under Chapter 11 of the Bankruptcy Code.  The 2007 Bar Date

Notice provided that all claims arising post-petition and pre-confirmation would

be discharged unless preserved.

Stockton has lived at the same address in St. Paul, Minnesota, since 1989.

Stockton testified that he received no communications from NWA about

its bankruptcy; nor did he receive any notice about filing a bankruptcy claim.

Stockton did not file a claim with the bankruptcy court.

### 2.  Applicability of Bankruptcy Discharge to Stockton's ADA and MHRA Claims

Confirmation of a debtor's reorganization plan discharges debts which

arose prior to the date of the confirmation and were not preserved.  See 11 U.S.C.

§ 1141(d)(1); McSherry v. Trans World Airlines, Inc., 81 F.3d 739, 740 (8th Cir.

1996).  Under this standard, ADA causes of action are subject to discharge by

bankruptcy plan confirmation.  McSherry, 81 F.3d at 740; see also 11 U.S.C. §§

101(12); 101(5)(A).  The bankruptcy code explicitly requires claims such as

Stockton's to be preserved.  See 11 U.S.C. § 503(b)(1)(A)(ii) (requiring

preservation of claims for "wages and benefits awarded pursuant to a judicial

proceeding . . . [for] back pay attributable to any period of time occurring after

[the bankruptcy petition] as a result of a violation of Federal or State law by the

debtor").  NWA's 2007 Bar Date Notice incorporated this requirement.

Additionally, when a plaintiff's ADA, or MHRA, claim arises after an

airline files for bankruptcy, but before the plan of reorganization is confirmed, if

the plaintiff does not file a claim by the bankruptcy court's deadline, his post-

petition, pre-confirmation claim is discharged, even if the plaintiff does not

received a right to sue letter until after confirmation.  McSherry, 81 F.3d at 740-

41.  Stockton's claims arose before the confirmation date.  Accommodation for

the sheet metal shop position was denied on February 20, 2007.  See Henderson

v. Ford Motor Co., 403 F.3d 1026, 1032 (8th Cir. 2005) (holding that ADA and

MHRA claims, including failure to accommodate, "accrue [on] the date on which

the adverse employment action is communicated to the employee," which was

15

the last time the employer refused to offer the plaintiff a job that she requested).

NWA ceased any attempt to accommodate Stockton on May 22, 2007, the end of

the ADE period.  There is no evidence that Stockton applied for any positions

after May 2007.  Although Stockton's official termination occurred post-

confirmation, in 2009, it was required by the AMFA CBA and "flowed naturally

from [Stockton's] leave status and was not a result of any affirmative conduct

attributable to [NWA]."  Holcombe v. US Airways, Inc., No. 08-1506, 369 Fed.

Appx. 424, 429 (4th Cir. Mar. 5, 2010).  There was no independent act by NWA

occurring after May 31, 2007.

The effective date of confirmation of NWA's plan was May 31, 2007, and

administrative expense claims, such as Stockton's, were required to be filed with

the bankruptcy court by July 30, 2007.  Stockton did not file a claim with the

bankruptcy court.  NWA concludes that, because Stockton did not preserve his

claim, his lawsuit was discharged by the reorganization plan confirmation.  See,

e.g., McSherry, 81 F.3d at 740-41.

### 3.    Notice

The Court cannot hold, as a matter of law, that Stockton's claims are discharged by NWA's bankruptcy, because there is a genuine question of material fact regarding whether he received adequate notice of the bankruptcy.

A bankruptcy creditor's claim will not be discharged if he did not receive adequate notice.  In re Hairopoulos, 118 F.3d 1240, 1244-45 (8th Cir. 1997).  As a creditor, Stockton had "a right to adequate notice and the opportunity to participate in a meaningful way in the course of bankruptcy proceedings." Id. at 1244 (citations omitted).  "The burden of establishing that a creditor has received appropriate notice rests with the debtor.  A letter properly addressed and mailed is presumed to have been delivered to the addressee." Id. (citation omitted).  Here, Stockton testified that he did not receive notice of the bankruptcy from NWA.

NWA points out that "[t]here is a presumption that a letter transmitted by mail was received by the addressee.  While the presumption is a rebuttable one it is a very strong presumption and can only be rebutted by specific facts . . . ." Kohler v. Anderson, No. 92-3011, 1993 WL 16013, at *1 (8th Cir. Jan. 28, 1993) (citations omitted).  "Denial of receipt does not, as a matter of law, rebut the presumption, but rather creates a question of fact." In re Am. Properties, Inc., 30

17

B.R. 235, 238 (Bankr. D. Kan. 1983) (citation omitted), <u>quoted in</u> <u>Kohler</u>, at *1.  "If the proper and correct address was not used the presumption cannot be activated."  <u>In re Am. Properties, Inc.</u>, 30 B.R. at 238 (citation omitted).

"In cases involving lack of notice, there is often little a party can do except swear he or she did not receive the communication."  <u>Am. Boat Co., Inc. v. Unknown Sunken Barge</u>, 418 F.3d 910, 914 (8th Cir. 2005).  Here, Stockton swears that he did not receive the notices.  He also points out that the affidavits of mailing indicate two different addresses for Stockton, although he has lived at the same address for the past twenty years, which raises a clear question of whether the notices were sent to Stockton at the correct address.  The multiple addresses listed, combined with Stockton's testimony that he did not receive the notices, raise a genuine dispute of material fact regarding whether the notices were delivered to Stockton.

### C.    Railway Labor Act

The Court rejects NWA's claim that Stockton's claims are barred by the Railway Labor Act.  The Railway Labor Act, 45 U.S.C. §151, <u>et seq.</u> ("RLA"), governs airline labor relations and provides "a comprehensive framework for resolving labor disputes."  <u>Hawaiian Airlines v. Norris</u>, 512 U.S. 246, 252 (1994).

> Preemption occurs if the claims are inextricably intertwined with consideration of the terms of the labor contract so as to require interpretation of the CBA.  The RLA requires parties to arbitrate "minor" disputes.  Minor disputes are those arising out of the application or interpretation of the collective bargaining agreement, and therefore, complete preemption applies to disputes involving duties and rights created or defined by the collective bargaining agreement.  There is a presumption that disputes are minor and thus arbitrable.

Bloemer v. Northwest Airlines, Inc., 401 F.3d 935, 938-39 (8th Cir. 2005) (citations omitted).

### 1.    RLA and Discrimination Claims

Discrimination claims are not precluded by the RLA if the claims arise from federal or state law.  See, e.g., Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1115 (8th Cir. 1995) (ADA).  Here, Stockton's claims arise out of violations of the ADA and MHRA and exist independent of the CBA; therefore, they are not precluded by the RLA.  See Taggert v. Trans World Airlines, Inc., 40 F.3d 269, 274 (8th Cir. 1994); Carpenter v. Northwest Airlines, Inc., No. CIV.00-2490 ADM/AJB, 2001 WL 1631445, at *2 (D. Minn. June 7, 2001).  NWA asserts that the CBA's seniority and bidding requirements prevented it from satisfying Stockton's requests to be transferred to an appropriate vacant position.  These allegations are not sufficient to invoke RLA preemption.  Claims are not

precluded by the RLA simply because a plaintiff may have to prove that he was

eligible and qualified under the CBA for a certain position or because the alleged

discrimination is based on a denial of rights provided for by the CBA, such as

bumping rights.  <u>Carpenter</u>, 2001 WL 1631445, at *2.

NWA also argues that Stockton's termination in January 2009 invoked the

CBA's requirements regarding employment status after a two-year layoff.  The

two-year waiting period and 2009 official termination are not the operative acts

in this case.  Rather, Stockton's claims survive based on acts that occurred in 2007

– the failure to accommodate occurring until the end of the ADE period.  The

Court concludes that, here, the CBA language is not inextricably intertwined

with Stockton's claims.  RLA preemption does not apply.

### D.   Merits of Discrimination Claims Based on the Failure to Hire for the Sheet Metal Shop Position

#### 1.   ADA and MHRA Standards

The ADA protects "any qualified individual with a disability" from

discrimination based on that disability.  <u>Phillip v. Ford Motor Co.</u>, 328 F.3d 1020,

1023 (8th Cir. 2002) (quoting 42 U.S.C. § 12112(a)).  Stockton also asserts a

disability discrimination claim under the MHRA.  Both claims are analyzed

under the <u>McDonnell Douglas</u> burden shifting analysis.  <u>Dovenmuehler v. St. Cloud Hosp.</u>, 509 F.3d 435, 439 n.4 (8th Cir. 2007).

The three elements of this prima facie case are: (1) that Stockton has  a disability within the meaning of the ADA or MHRA; (2) that he is qualified to perform the essential functions of his job, with or without reasonable accommodation; and, (3) that he suffered an adverse employment action because of his disability.  <u>Dovenmuehler</u>, 509 F.3d at 439.

The ADA was amended, effective January 1, 2009, to broaden the definition of disability.  Because the conduct allegedly giving rise to Stockton's claims occurred before that date, the previous version of the ADA applies.  <u>See Nyrop v. Indep. Sch. Dist. No. 11</u>, 616 F.3d 728, 734 n.4 (8th Cir. 2010).  With respect to the first element of the prima facie case, the ADA defines disability in the following three ways: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(1).  The MHRA is "less stringent," requiring that an impairment only "materially limit a major life activity."  <u>Liljedahl v. Ryder Student Transp. Servs., Inc.</u>, 341 F.3d 836, 841 n.3 (8th Cir. 2003).

21

2.     **Prima Facie Case**

a)     **Disabled**

To qualify under the ADA, an impairment and its associated restrictions must substantially limit at least one major activity.  "Substantially limits" means

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).

With respect to the major life activity of working—

(i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

Id. § 1630.2(j)(3).

There is a genuine issue of material fact regarding whether Stockton was substantially limited in the major life activity of working.  "[A]n ADA plaintiff need not demonstrate that her impairment restricts her ability to perform all jobs.  Rather, . . . an individual is disabled when her impairment merely prevents

performance of a certain class of jobs." Webb v. Garelick Mfg. Co., 94 F.3d 484,

487 (8th Cir. 1996).   Stockton's expertise, background, and job expectations are

relevant in defining the class of jobs used to determine whether he is disabled.

Id.; see also 29 C.F.R. § 1630.2(j)(3)(ii).  Stockton had a long work history with

NWA, including working as an aircraft mechanic, line maintenance technician,

and plant maintenance technician.   Therefore, this is the range of jobs to be

considered.  Webb, 94 F.3d at 488.  In the work area of airline technicians,

mechanics, and maintenance, the evidence before the Court, which consists

solely of positions at NWA, is that these jobs all require heavy lifting and

kneeling and bending in awkward spaces, because all require work on or around

the aircraft.  Indisputably, based on Stockton's physician's restrictions, Stockton

is restricted from performing these tasks.  NWA itself concluded that he was

medically disqualified to perform the sheet metal shop job, and it did not

identify any other jobs that he could perform with his experience and skills.

Stockton's QRC concluded that Stockton needed to be retrained because his

skills, combined with his work restrictions, made it impossible to find

appropriate work.

### b)    Qualified

Although Stockton has raised genuine question of material fact regarding whether he can meet the disabled prong, his discrimination claim based on the sheet metal shop position fails because he cannot show that he was qualified for the position.

> The determination of whether an employee is qualified to perform the essential functions of a job involves a two step inquiry.  First the employee must show that she meets the necessary prerequisites for the job, and then she must demonstrate that she can perform the essential functions, with or without reasonable accommodation.  If the employee establishes that she cannot perform the essential functions of the job without accommodation, she must also make a facial showing that reasonable accommodation is possible and that the accommodation will allow her to perform the essential functions of the job.

Burchett v. Target Corp., 340 F.3d 510, 517 (8th Cir. 2003) (citations omitted).

Lambert provided undisputed testimony that aircraft duties were essential functions of the sheet metal shop job.  Lambert is an accommodations specialist with personal familiarity with the sheet metal shop position, who had conferred with the shop manager to determine what functions were essential job duties. NWA provided evidence that, after the 2005 strike, the nature of NWA's operations changed significantly: departments and jobs were streamlined to enhance efficiency, and sheet metal shop employees were required to be able to perform all job functions outside of the shop and in and on the aircraft.

24

An employer's judgment regarding the essential functions of its job is considered "highly probative." Alexander v. Northland Inn, 321 F.3d 723, 727 (8th Cir. 2003). Additionally, an employer is not required to reallocate the essential functions of a job to other employees or to exempt an employee from the required essential task because "an accommodation that would cause other employees to work harder, longer, or be deprived of opportunities is not mandated." Rehrs v. The Iams Co., 486 F.3d 353, 357 (8th Cir. 2007) (citation omitted).

Stockton cannot show that he was qualified for the sheet metal shop position. There is no evidence presented that, after 2005, the job did not require, as essential functions, regularly working in the aircraft and regularly working on the line maintenance. Stockton testified as to what the job used to entail when he performed it pre-strike, but he does not purport to have any knowledge regarding the job post-strike. Additionally, Stockton admits that there are no reasonable accommodations that could allow him to perform the aircraft-based tasks, other than having other workers do those tasks.

**E.     Accommodation Process**

While Stockton cannot establish that he was qualified for the sheet metal shop position, his claims do survive summary judgment based on his theory that NWA violated the ADA by failing to engage in the interactive accommodation process with him.  "An employer's failure to make a reasonable accommodation is a separate form of prohibited discrimination under both the ADA . . . ." Buboltz v. Residential Advantages, Inc., 523 F.3d 864 (8th Cir. 2008).

### 1.    Reasonable Accommodation Process Standard

An employer engages in accommodation discrimination under the ADA by

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer].

42 U.S.C. § 12112(b)(5)(A).

> Where the employee requests accommodation, the employer must engage in an "informal, interactive process" with the employee to identify the limitations caused by the disability and the potential reasonable accommodations to overcome those limitations.  An employer hinders this process when: the employer knows about the employee's disability; the employee requests accommodations or assistance; the employer does not in good faith assist the employee in seeking accommodations; and the employee could have been reasonably accommodated but for the employer's lack of good faith.

Battle v. United Parcel Serv., Inc., 438 F.3d 856, 862-63 (8th Cir. 2006) (citations omitted).  "When an employer fails to engage in an interactive process, that is prima facie evidence of bad faith."  Buboltz, 523 F.3d at 870 (citation omitted).

As previously set forth, Stockton raised a genuine issue of material fact regarding whether he is actually disabled.  See Kirkeberg v. Canadian Pac. Ry., 619 F.3d 898, 906 n.4 (8th Cir. 2010).  NWA knew of this disability and specifically listed Stockton's restrictions in its accommodations analyses.  Stockton requested accommodation or assistance – he engaged in the two accommodations meetings and asked for access to NWA computers for lists of available jobs for bumping.

### 2. Discussion

#### a) Whether NWA, In Good Faith, Assisted Stockton in Seeking Accommodations

There is plentiful evidence that NWA did not assist Stockton in good faith in seeking accommodations.  Although NWA gave Stockton information on exercising his seniority and bumping, it allowed him to bump into the sheet metal job without first informing him of the job's new requirements of working on the aircraft and lifting heavy items.  These requirements were not included in a written job description and did not exist in 2005, when Stockton had previously

worked at that job, but existed solely in NWA's private knowledge.  NWA

sprung the wholly new, unwritten essential functions of that position at the

February 2007 accommodations meeting.  NWA put the onus on Stockton to

suggest accommodations for the sheet metal shop position during the meeting,

with no forewarning regarding what that job entailed.  It then rejected his

suggestions out of hand.

"[T]he employee does not have the burden of identifying open positions

without the employer's assistance."  Taylor v. Phoenixville Sch. Dist., 184 F.3d

296, 316 (3d Cir. 1999), cited in Cravens v. Blue Cross & Blue Shield, 214 F.3d

1011, 1022 (8th Cir. 2000).  The employer bears that burden.  Id.   Although

Stockton asked NWA and Lambert for help, he received none.  NWA did not

provide him access to the NWA job book, a list of mechanics jobs for bumping, or

job information after the ADE.  There is strong evidence that this was not a good

faith interactive process.  NWA did not suggest another position that was vacant

or that he could bump into that would be possibly appropriate, such as work not

involving climbing on the aircraft.  Stockton further testified that, leading up to

and throughout the ADE, Lambert failed to inform him of appropriate positions.

NWA did not allow him to use NWA computers to view all available positions.

NWA told Stockton to find his own appropriate job, although accurate written job descriptions did not exist and it would not allow him access to NWA resources to determine which jobs were available to him.  "The breakdown in communications that apparently occurred in the present case is especially troubling in a large company like [NWA], where workers may not be aware of the range of available employment opportunities." <u>Cravens</u>, 214 F.3d at 1022 (citation omitted).  NWA's assistance was particularly needed in light of its assertion that the job descriptions had changed after the 2005 AMFA strike combined with the fact that it had not created new written job descriptions for the jobs after the strike.

NWA cannot simply represent that there are no accurate written job descriptions of any AMFA jobs, fail to share the true requirements of those jobs with Stockton, fail to suggest an appropriate position, deny Stockton access to NWA resources listing AMFA positions available either through vacancy or bumping, tell him to find and apply for appropriate jobs on his own, and claim to have adequately participated in the interactive process.

   **b)  Whether NWA Could Have Reasonably Accommodated Stockton but for NWA's Lack of Good Faith**

There is a genuine issue of material fact regarding whether Stockton could have been reasonably accommodated, but for NWA's lack of good faith. Stockton testified that that he applied for other jobs for which he was qualified, but was rebuffed.  He had previously worked for NWA under the same restrictions in multiple jobs and that he had very high seniority and bumping rights such that many AMFA jobs were available to him.

**F.      Merits of Retaliation Claims**

The Court also denies summary judgment on Stockton's claim that NWA retaliated against him because of his request for a reasonable accommodation.

**1.      Retaliation Standard**

"No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a).  The <u>McDonnell Douglas</u> burden shifting framework applies.  <u>Stewart v. Indep. Sch. Dist. No. 196</u>, 481 F.3d 1034, 1042-43 (8th Cir.  2007).

> Under this framework, the initial burden is on the plaintiff to establish a prima facie case, consisting of evidence: (1) that he or she engaged in statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection

exists between the two events.  If the plaintiff establishes a prima facie case, the burden then shifts to the defendant to show a non retaliatory reason for the adverse employment action.  If the defendant can show a legitimate, non-retaliatory reason for its actions, the burden returns to the plaintiff who is then obliged to present evidence that (1) creates a question of fact as to whether [defendant's] reason was pretextual and (2) creates a reasonable inference that [defendant] acted in retaliation.

Id. at 1043 (citations omitted).  The MHRA retaliation claim is subject to the same standard.  Heisler v. Metro. Council, 339, F.3d 622, 632 n.6 (8th Cir. 2003).

### 2.       Statutorily Protected Conduct

Stockton engaged in statutorily protected conduct under the ADA and MHRA by requesting reasonable accommodations for his disability.  See Kirkeberg v. Can. Pac. Ry., 619 F.3d 898, 907-08 (8th Cir. 2010); Hoover v. Norwest Mortgage Banking, 632 N.W.2d 534, 549 (Minn. 2001).

### 3.       Causal Connection and Temporal Proximity with the Adverse Action

The Court concludes that Stockton has satisfied the causal connection requirement with the close temporal proximity between his request for accommodation and NWA's adverse employment action.

NWA argues that Stockton's separation from employment two years after the accommodation request and denial is too far removed to create an inference

31

of retaliation.  It further points out that the separation letter was computer
generated pursuant to CBA mandates, and that the NWA personnel who signed
the letter had never met Stockton, nor knew of his physical restrictions or
pending EEOC charge.  However, NWA focuses on the wrong adverse action.
The relevant action is not the official termination in 2009, but the placement onto
layoff status, coupled with a failure to accommodate, in 2007.

Stockton presents evidence that, directly after he requested
accommodation, NWA placed him on layoff status, disregarded his seniority,
and set him up to be terminated in 24 months.  The two-year time period
between the time he requested accommodation and the date he was terminated
does not break the causal connection, because the termination followed from
NWA's failure to accommodate and placement of Stockton on layoff status in
2007.  The inevitable road to termination was put in place in 2007.  Stockton has
presented evidence that NWA used the CBA's 24-month layoff period as a tool to
discharge him.

### 4.     Pretext

Stockton has presented sufficient evidence that NWA's anemic response to
his requests for accommodation show that it harbored animosity towards him

based on his disability.  <u>See, e.g.</u>, <u>Finan v. Good Earth Tools, Inc.</u>, 565 F.3d 1076,

1080 (8th Cir. 2009).   Stockton further notes that NWA deactivated his ID badge

and denied him access to NWA facilities and computers for relevant job search

information.  He further points to NWA's incorrect response to his request for

information on disability benefits.  The Court concludes that Stockton has

presented sufficient evidence to avoid summary judgment on his ADA and

MHRA claims.


Accordingly, based upon the files, records, and proceedings herein**, IT IS

HEREBY ORDERED**:

Defendant Northwest Airlines, Inc.'s Motion for Summary
Judgment [Docket No. 14] is **DENIED**.


Dated:   March 30, 2011                    s/ Michael J. Davis
                                           Michael J. Davis
                                           Chief Judge
                                           United States District Court